### THE RUSSELL 23.

### THE MATTON 21.

### NEWTOWN CREEK TOWING CO. et al. v. TUG MATTON 21 et al.

#### No. A–16324.

District Court, E. D. New York.
July 2, 1942.

Alexander & Ash, of New York City (Edward Ash, of New York City, of counsel), for libelants.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for claimant.

BYERS, District Judge.

This cause involves a collision between the tank barges Russell 23 and the barge Oil Transfer 23 in the New York State Barge Canal at the Belgium Bridge on November 7, 1940. The former was being pushed by the Diesel tug J. Raymond Russell, and the latter by the steamtug Matton 21.

The Russell 23 was westbound and the Oil Transfer 23 was eastbound, and the libel was filed against the Matton 21.

By reason of the confusing course of the canal in this section, no attempt will be made to refer to the compass points.

The collision occurred at about 5:55 p.m., after darkness had set in, and both tows carried proper lights, and there was no effective wind or other weather condition; the controversy turns solely upon the navigation of the respective tows.

The claimant offered Exhibit D, a profile survey, to establish depths under the bridge, which was made about a year after the collision; for lack of legal evidence that the depths so established obtained on November 7, 1940, the exhibit is deemed in evidence solely to establish the distance between the red and white beacons on the bridge, which indicated the width of the channel under the bridge, namely, 120 feet.

The respective port bow corners of the barges were in contact; that is, the westbound Russell 23 struck the eastbound Oil Transfer 23 about 1½ feet inside the port bow corner of the latter. This means that clearance was avoided by a matter of only 2 feet or so, and that more careful navigation would seem to have been possible on the part of both tugs.

It will be convenient to follow the course of each tow as the testimony is understood.

The Russell 23 is a steel barge, 229.5 feet long and 42.8 feet in beam, having a depth of hold of 14 feet 1 inch.

The Diesel tug J. Raymond Russell is 78.5 feet long, and 22 feet in beam, and has a depth of hold of 9.8 feet, and 525 horse power.

Thus the westbound tow was about 309 feet long (probably slightly less, since the bow of the tug fitted into the stern of the barge, which was constructed for push boat towing). The tug drew 11 feet aft, which was the greatest depth of that tow.

The steel barge Oil Transfer 23 is 212.1 feet long and 36.1 feet in beam, and has a depth of hold of 12.1 feet.

The Matton 21 is 70.6 feet between perpendiculars and has a beam of 20.2 feet, a depth of hold of 9 feet, and 150 horse power.

Thus the eastbound tow was about 282 feet long and required about the same depth of water for safe navigation as the Russell tow. There is no criticism of the make-up of either.

As the Russell tow approached the Belgium Bridge, she had to make an almost 90° turn to her port hand, starting at a distance of about 2,000 feet from the bridge; at that point she blew a bend whistle and reduced her speed from about 5 miles an hour to about 3. The pilot heard no answer to his bend whistle but, as he rounded the bend, he saw the Matton 21 coming down around another bend on the far side of the bridge. The Russell tow, being under a slow bell, blew a whistle for sides, to which no answer was heard, and then another, which the pilot says was also unanswered; by this time the Russell tow was nearing the bridge, and blew an alarm because the pilot said the other tow was approaching at a higher speed than his, and the situation appeared ominous.

This pilot assumed that the Matton tow would go through the bridge in what would be the starboard draw to the latter, and the port draw as the Russell was proceeding.

In this he was mistaken and, to the extent that he acted on that assumption, he must be held at fault, because the red and white lights on the bridge should have been a sufficient indication to him that passage between the tows would have to be between those lights; for failure to recognize this plain aspect of the situation, I believe that the Russell tow did not incline sufficiently to its own starboard to avoid the contact which took place; it is true that there is no admission on the part of the pilot of the Russell to justify this statement, but it seems clear that there must have been a tardy effort on the part of the westbound

tow to get over to its own starboard hand, in view of the situation as it was presented.

It is urged for the Russell that the pilot had a right to assume the use of the other draw by the Matton 21, since there was a sufficient depth of water in that draw; and hence, that the Russell was entitled to navigate closely to the center of the canal; however, it seems to me that the evidence clearly establishes that it was not the custom for canal traffic, speaking generally, to use that side of the canal, although there were instances to the contrary, and that it was the duty of the Russell tow to proceed, from the bend which has been referred to to the bridge, as closely to its own starboard hand as cautious navigation permitted, in view of the prompt perception of the oncoming barge and tug.

Turning now to the situation as it was observable from the eastbound Matton 21, the testimony of her pilot is accepted, that he also blew a bend signal as he rounded a bend on his own port hand which was almost as abrupt, but not quite, as the one around which the Russell tow had come, and that this was also at a distance of some 2,000 feet from the bridge. He had a current under foot of about a mile an hour, which at the bridge may have tended to set him over to his port side; he approached the bridge holding well to the center of the canal, but aware of the presence of the other tow because he sent a deckhand out to the bow of the Oil Transfer 23, having observed a searchlight flashing in the air while he was yet on the far side of the bridge. He says he was under a slow bell rounding the bend, and immediately slowed down to a jingle and a gong, which is a half bell. He says he heard no answer to his bend signal, and that testimony is accepted. But at some time which is not clearly shown, he blew a one-whistle signal for sides, at which time he must have realized that there was an approaching tow which he would have to pass, and he says that he heard a one-whistle answer; later, but how soon he does not state, he saw the lights of the other vessel, when the bow of his barge was about 300 feet from the bridge. At that time he was in the center of the canal, and so it must follow that these tows were approaching under the respective bells which have been stated, almost head and head.

The pilot of the Matton 21 observed that the approaching tow was inclining to its own starboard hand, and I am persuaded that he held his own course, either with an air of conscious rectitude, or because he felt certain of his right to proceed under the draw which was on his port hand, without favoring the starboard side of the channel, or effectively slowing down, in face of the approaching tow, until it was too late to avoid collision.

Under cross-examination, he somewhat endeavored to demonstrate that he veered slightly to his own starboard at about 75 feet from the bridge, but that testimony impressed me as having been tendered in the effort to exculpate his navigation, rather than because it was in strict accord with the actual events.

It is true that both pilots placed themselves close enough to the bridge abutments on their respective starboard sides, at the time of collision, to prove that it could never have taken place unless the Russell was practically athwart the canal, but such testimony was of little persuasive force.

It will be recalled that there was 120 feet of water in which these tows could pass, and that their combined beams did not exceed 80 feet, so that there was a margin of 40 feet for accommodation, and under all the circumstances of the case it seems that where clearance was missed by so little as 2 feet, it is reasonable to conclude that both navigators were at fault, and in consequence it is a half-damage case.

The foregoing recital is thought to comprehend the findings in narrative form but, if anything is to be gained by stating them in numbered paragraphs, they may be settled on notice.

The libelants may have a decree for half damages, to be settled.